STATE OF NORTH CAROLINA v. LEONARD D. AVERY

No. 561A83

(Filed 10 December 1985)

**1. Criminal Law § 29— impaired memory—mental capacity to stand trial**

The trial court did not err in ruling that defendant had the mental capacity to stand trial and to assist in the preparation of his defense, notwithstanding defendant was suffering from an impaired memory concerning the events at issue, where the trial court found that although defendant's memory was impaired and his intellectual functions, judgment and insight were limited, he was able to understand the nature and object of the proceedings against him and comprehend his situation in reference to those proceedings, and he was capable of assisting his attorneys in the preparation of his defense in a rational and reasonable manner. The Court refused to adopt the rule that a defendant is incompetent to stand trial or assist in the preparation of his defense when the defense pleaded is insanity and defendant's amnesia hampers preparation of his defense in a crucial way. N.C.G.S. 15A-1001.

**2. Homicide § 12.1— indictment for first degree murder—failure to allege premeditation and deliberation or felony murder**

Article I, § 23 of the N.C. Constitution and N.C.G.S. 15A-924(a)(5) did not repeal the statute authorizing a short form indictment for murder, N.C.G.S. 15-144. An indictment in the form authorized by N.C.G.S. 15-144 was sufficient to charge first degree murder without specifically alleging premeditation and deliberation or felony murder.

**3. Constitutional Law § 60; Grand Jury § 3.3; Jury § 7.4— use of voter registration lists—random selection by computer—no systematic exclusion of non-whites from grand jury—fair cross-section of community**

There was no systematic exclusion of non-whites from the jury pool from which the grand jury was drawn so as to deny defendant equal protection under the Fourteenth Amendment where non-whites constituted 35.9 percent of the eligible population in the county for service on a jury; the county voter

1

State v. Avery

registration list was used as a master jury list from which a computer random-
ly selected the jury pool; the jury pool was then purged of deceased and in-
competent persons; the result was a jury pool with 26.3 percent non-whites;
and this result represents only a 9.6 percent deviation between the percentage
of non-whites in the county and the percentage of non-whites in the jury pool.
Nor did selection of the jury pool in such manner violate defendant's right to
be tried by a petit jury drawn from a representative cross-section of the com-
munity as guaranteed by the Sixth Amendment. N.C.G.S. 9-2.

**4. Criminal Law § 5— insanity defense—burden of proof**

The Supreme Court declined to change the common law rule in North
Carolina that insanity is an affirmative defense which must be proved by the
defendant.

**5. Constitutional Law § 63; Jury § 7.11— death qualification of jury**

The death qualification of the jury in a first degree murder trial did not
violate defendant's rights to due process and trial by a jury drawn from a
representative cross-section of the community.

**6. Jury § 7.11— excusal of jurors for death penalty views**

Twelve potential jurors were properly excused for cause under the re-
quirements of *Witherspoon v. Illinois*, 391 U.S. 510 and N.C.G.S. 15A-1212(8)
where each of the jurors indicated that they could not vote for the death
penalty under any circumstances.

**7. Jury § 6.3— prospective jurors—exclusion of questions relating to insanity de-
fense—no abuse of discretion**

The trial court did not abuse its discretion in refusing to permit defense
counsel to ask two prospective jurors certain questions relating to the insanity
defense where the questions were hypothetical and tended to stake out the
jurors and cause them to pledge themselves to a future course of action at a
stage of the trial when no evidence had been presented and no instructions
had been given on the applicable law.

**8. Jury § 7.8— excusal of jurors for cause—no abuse of discretion**

The trial court in a prosecution for first degree murder and various other
crimes did not abuse its discretion in excusing five prospective jurors for
cause based on reasons of employment, conflicts, religious opinion, opposition
to the death penalty, and potentially prejudicial knowledge of defendant's
parole opportunity if convicted.

**9. Jury § 7.7— challenge for cause—failure to exhaust peremptory challenges**

Defendant was not prejudiced when the trial court refused to allow de-
fendant to elicit from a juror the opinion expressed to the juror by friends
about defendant's guilt or innocence and denied defendant's challenge for
cause to the juror where defendant exercised a peremptory challenge to
remove the juror, and defendant failed to exhaust all of his peremptory
challenges. N.C.G.S. 15A-1214(h).

**10. Burglary and Unlawful Breakings § 1— IBM complex—separate charges relating to different buildings**

Four connected buildings in an IBM complex, constructed at different times and treated as separate buildings by those using them, with separate building numbers, do not constitute only one building under the breaking or entering statute, N.C.G.S. 14-54, because the buildings are connected by passageways that permit unrestricted access from one building to another. Therefore, the trial court correctly treated the IBM complex as four separate buildings and did not err in failing to dismiss three of the four charges against defendant for felonious entry into four buildings in the complex on the ground that only one building was involved.

**11. Arson §§ 1, 4— conviction under N.C.G.S. 14-67.1—burning not required—sufficiency of evidence**

A conviction under N.C.G.S. 14-67.1 does not require that the State prove a "burning" as is required under the arson statute and the common law but requires only that a defendant willfully and wantonly *attempt* to set fire to or burn any building or structure. The evidence was sufficient to support defendant's conviction for attempting to set fire to or burn a building under N.C.G.S. 14-67.1 where it tended to show that defendant ignited a fire bomb in Building 201 of the IBM complex which caused some blackening of the floor tile, a steel cabinet and an office partition, and that some burned matches were also found in Building 201.

**12. Homicide § 4.2— attempted burning of building—use of fire bombs—underlying felony for felony murder**

Fire bombs used by defendant were deadly weapons used in the perpetration of the felony of attempting to burn a building used for trade, and the killing of the victim in this case was in the perpetration of this felony within the meaning of N.C.G.S. 14-17. Therefore, the felony of attempting to burn a building could serve as the underlying felony under the felony murder rule.

**13. Criminal Law § 88.2— cross-examination of expert witness—knowledge of certain criminal cases—exclusion not error**

In a prosecution for a murder and various other crimes wherein the State's expert rebuttal witness testified that defendant's violent outburst did not "fit with the literature about Post Traumatic Stress Disorder (PTSD) types of outburst," the trial court did not err in refusing to permit defendant to ask the witness questions about his familiarity with the facts of certain criminal cases involving the PTSD defense where the court permitted defendant to question the witness extensively on his familiarity with PTSD literature, and the verdict was thus not improperly influenced by the court's limitation of defendant's cross-examination of the witness.

**14. Criminal Law § 173— opening door to evidence of defendant's misconduct**

When defendant elicited testimony from his mother that he had not been involved in any court action involving his brother's children and that there had been no allegations that defendant had misused any money of these children, defendant "opened the door" to the State's introduction of written exhibits showing the facts surrounding his involvement in the alleged court action for

the purpose of impeaching defendant's testimony on cross-examination denying any involvement in or knowledge of such a court action.

**15. Criminal Law § 63.1— length of witness's flashbacks concerning Vietnam — exclusion of testimony**

The trial court did not err in refusing to allow defendant's surrebuttal witness to testify concerning the length of his own "flashbacks" concerning Vietnam for the purpose of rebutting the State's psychiatric testimony that dissociative episodes related to PTSD were of limited duration and not consistent with defendant's conduct at the time of his offenses where the witness was not qualified as an expert and no expert testimony was introduced to show that he had PTSD; the witness testified that he was using drugs prior to his alleged dissociative episode; and the State's psychiatric witnesses did not testify that extended dissociative episodes related to PTSD were impossible but only that such episodes were not generally consistent with PTSD.

**16. Homicide § 30.3— first degree murder—refusal to submit involuntary manslaughter—conviction under felony murder rule**

The trial court in a first degree murder prosecution did not err in refusing to submit to the jury the lesser included offense of involuntary manslaughter where the law and evidence justified use of the felony murder rule, defendant was found guilty of first degree murder under the felony murder rule, and there was no evidence to support submission of involuntary manslaughter.

**17. Assault and Battery §§ 14.6, 15.4— assault on law officer—knowledge that victim was officer—absence of instruction**

Knowledge by defendant that the victim was a law enforcement officer is an essential element of the crime of assault with a firearm upon a law enforcement officer in violation of N.C.G.S. 14-34.2, and the trial court's failure to so instruct the jury constituted prejudicial error. However, by finding defendant guilty of felonious assault upon a law enforcement officer, the jury necessarily found the facts that would support defendant's conviction of the lesser included offense of assault with a deadly weapon, and the case will be remanded to permit resentencing on the charge of assault with a deadly weapon.

**18. Criminal Law § 112.6— presumption as to sanity—instructions—use of "in doubt"**

The trial court's instruction that "if you are in doubt as to the insanity of the defendant, the defendant is presumed to be sane and you would find the defendant guilty" did not improperly convey to the jury that defendant was required to overcome all doubt on this issue when considered in context with the court's other instructions on the burden of proving insanity.

**19. Criminal Law § 119— charge in substantial accord with requested instructions**

The trial court gave instructions substantially in accord with defendant's requested instructions pertaining to general criminal intent or *mens rea,* specific intent and willfulness insofar as the requested instructions were a correct statement of the law and proper in the context of the case.

State v. Avery

**20. Criminal Law § 138.29— defendant as dangerous and mentally abnormal person—proper aggravating factor**

The trial court's finding as an aggravating factor that "defendant is a dangerous and mentally abnormal person whose commitment for an extended period of time is necessary for the protection of the public and society at large" did not punish defendant for being mentally ill but constituted a finding that defendant was abnormal in the sense of being unusually dangerous, and it was proper for the court to find such a factor in aggravation.

**21. Criminal Law § 138.15— aggravating factor—separate finding for each crime**

The record reveals that the trial court made a separate finding in aggravation that defendant is a dangerous and mentally abnormal person for each crime in accordance with the rule stated in *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689.

**22. Criminal Law § 138.15— two findings in aggravation not based on same evidence**

The trial court's findings in aggravation that defendant is a dangerous and mentally abnormal person and that defendant engaged in a pattern or course of violent conduct were not based on the same evidence in violation of N.C.G.S. 15A-1340.4(a)(1)(p) where there was sufficient evidence that defendant had engaged in a pattern or course of violent conduct to support the judge's finding of that factor in aggravation separate and apart from the evidence of a psychiatrist which supported the aggravating factor that defendant is a dangerous and mentally abnormal person.

**23. Criminal Law § 138.30— mitigating factors found by jury in capital case—failure of judge to find in non-capital cases**

The trial court did not abuse its discretion in failing to find as mitigating factors in non-capital felony cases all of the mitigating factors found by the jury in the sentencing phase of a capital case tried with the non-capital cases.

**24. Criminal Law § 26— felony murder—no separate punishment for underlying felony—separate punishment for other crimes**

When a defendant has been convicted of first degree murder based upon a finding that the murder was committed in the perpetration of a felony, separate punishment may not be imposed for the underlying felony. However, separate punishment may be imposed for any offense which arose out of the same transaction but was not the underlying felony for the murder conviction.

**25. Criminal Law § 26— felony murder—separate punishments for crimes not underlying felonies**

Where a first degree murder conviction was premised on the underlying felony of burning or attempting to burn a certain building used in trade, the trial court could properly impose separate punishments for felonious entry convictions and two other felonious burning convictions which were not submitted as possible underlying felonies.

Justice BILLINGS did not participate in the consideration or decision of this case.

APPEAL by defendant pursuant to G.S. 7A-27(a) from a judgment imposing life imprisonment, entered by *Lee, J.*, at the 31 May 1983 criminal session of DURHAM Superior Court upon a jury verdict of guilty of first degree murder. Defendant was also convicted of three counts of assault with a deadly weapon inflicting serious injury, two counts of assault with a firearm upon a law enforcement officer, four counts of felonious entry of a building, misdemeanor assault with a deadly weapon, attempting to burn a building used for trade, and setting fire to or burning a building used for trade. Defendant's motion to bypass the Court of Appeals on his appeal from the judgments in the non-capital cases was allowed by the Supreme Court on 2 October 1984.

*Lacy H. Thornburg, Attorney General, by Christopher P. Brewer, Assistant Attorney General, for the State.*

*Ann F. Loflin and Thomas F. Loflin, III, Attorneys, for defendant-appellant.*

FRYE, Justice.

The essential facts are that defendant, Leonard D. Avery, was employed at IBM in the Research Triangle Park during July and early August 1982. He worked under the supervision of an IBM Manager, Shirley Johnson. Doctors at IBM had been advised that defendant was suffering from a mental condition diagnosed by doctors at the Veterans Administration Hospital in Durham, North Carolina, as Post Traumatic Stress Disorder (PTSD). Defendant had been given permission to be absent from work to attend PTSD treatment sessions at the VA Hospital. During July and August, defendant was absent from work for the purpose of attending PTSD sessions on the advice of his doctor at the VA Hospital. He did not, however, attend these therapy sessions during his absence. Mrs. Johnson contacted the defendant and scheduled an appointment for him with Dr. Patrick Connor of the IBM Medical Department on 18 August 1982. During the appointment, defendant became upset, angry, and defensive when Dr. Connor confronted him with the fact that he knew defendant had not attended a therapy session in several weeks. The interview was terminated shortly thereafter.

Dr. Connor believed defendant to be dangerous and he so advised his superiors in the medical department and other of-

ficials at IBM. As defendant was leaving the interview, he told Mrs. Johnson that he would be back to blow the place up starting with the medical department. Mrs. Johnson notified her manager and appropriate officials in the medical, security, and personnel departments concerning what had occurred. The decision was then made to terminate the defendant's employment with IBM. Mrs. Johnson called defendant on 19 August 1982 and informed him of this decision.

On 23 August 1982, defendant went to the Dixie Loan Company in Raleigh and purchased a .45 caliber semi-automatic rifle, two boxes of ammunition containing fifty bullets each and two 30-round ammunition clips. On 26 August 1982, defendant returned to the Dixie Loan Company and complained that the gun he had bought was jamming and exchanged that weapon for another .45 caliber automatic rifle.

Defendant was scheduled to be admitted to the VA Hospital on 17 August 1982 under the treatment of Dr. Owen Buck, a psychiatrist who was treating defendant for PTSD. He did not, however, appear for admission. Defendant called Dr. Buck on 23 August 1982 and requested a letter excusing his absences from work in August of 1982. When Dr. Buck declined to write such a letter, defendant told him that was all right that he would read about it in the newspaper. Dr. Buck notified the medical department at IBM of these matters prior to 30 August 1982.

On 30 August 1982 at approximately 1:00 p.m., defendant drove up to the loading dock of Building 205 which housed the medical department of the IBM Complex. He was wearing army fatigues and a hat with medals on it. He had several weapons, ammunition and homemade fire bombs of gasoline or some other flammable substance in his possession or in his car. Defendant was observed entering Building 205 through an open loading dock, and the IBM security section was notified. The manager of security called the Durham County Sheriff's Department, the North Carolina Highway Patrol and the IBM Medical Department.

As defendant proceeded toward the medical department in Building 205, he encountered Daniel Gooch, an employee of IBM, in the hallway. Defendant told Gooch to back up against the wall if he wanted to live. Defendant then entered the medical depart-

State v. Avery

ment and began firing as employees scattered to safety. He then ignited a fire bomb in the medical department.

Defendant then exited the medical department through the hallway or ramp toward Building 201 of the IBM Complex. At the end of the hallway, defendant ignited another fire bomb. A contract construction worker passed defendant to extinguish the fire, but defendant told him to let the fire burn. A nurse supervisor from the IBM Medical Department then approached defendant in the hallway and asked him if she could help him or if anything was wrong. Defendant then struck her on the head with the butt of the rifle, knocking her to the floor. The nurse supervisor sustained a laceration and hematoma above the right ear and was treated and released at Rex Hospital. Defendant continued through the hallway to Building 201, firing shots from the rifle on the way.

In Building 201, defendant encountered Ralph Glenn, an employee of IBM. Mr. Glenn asked defendant what he was doing and if he could help him. Defendant told Glenn to get out of his way and subsequently shot Glenn in the chest. Ralph Glenn died as a result of the gunshot wound to his chest. Defendant then ignited a fire bomb in Building 201.

After leaving Building 201, defendant entered Building 303 where he shot Richard Martin in the chest. Martin later underwent surgery and was in serious condition for approximately ten days before he slowly recovered and was able to return to work in October 1982. After leaving Building 303, defendant shot Charles Davis in the left elbow. The bullet was surgically removed from Davis' arm, and he fully recovered in approximately seven weeks. Defendant also shot and wounded Charles Thompson. Thompson received medical attention at the hospital for minor injuries.

Defendant then entered Building 203 where he ignited a fourth and final fire bomb. While defendant was in Building 203, a Durham County Sheriff's Department Deputy arrived. When the deputy encountered defendant in the building, defendant fired at him. The deputy waited for assistance, during which time defendant returned to his car. While leaving the IBM Complex, defendant fired shots at another sheriff's deputy who fired three shots

from his shotgun into the back of defendant's car as it drove away.

The deputies, as well as a number of highway patrol troopers, followed defendant's car from the IBM Parking Lot down Interstate 40 into Raleigh where a roadblock was set up by the Raleigh Police Department. Defendant stopped his car before reaching the roadblock. Defendant then shot himself in the head with a .22 caliber derringer pistol. Defendant was then transported to Durham County General Hospital where he underwent brain surgery to remove the bullet. The surgery necessitated the removal of the entire left frontal lobe of defendant's brain and a small portion of the right frontal lobe.

Later processing of the crime scene at IBM on 30 August 1982 revealed that a total of twenty-eight shots were fired while defendant was inside the various IBM buildings. Burned or charred areas were observed in four locations in the IBM Complex: (1) in the medical department of Building 205; (2) in the passageway running between Building 205 and Building 201; (3) near a cabinet in Building 201; and (4) in Building 203.

After defendant was sufficiently recovered, he was released from Durham County General Hospital and transferred to the Central Prison Hospital in Raleigh. He was later transferred to Dorothea Dix Hospital where he was examined by Dr. Bob Rollins, head of the Forensic Psychiatry Unit at Dorothea Dix Hospital, who made the determination that defendant was competent to stand trial even though defendant was unable to remember the events at the IBM Complex on 30 August 1982.

After a jury trial, defendant was convicted of first degree murder predicated on the felony murder rule, two counts of assault with a firearm upon a law enforcement officer, four counts of felonious entry of a building, a misdemeanor assault with a deadly weapon, attempting to burn a building used for trade, and setting fire to or burning a building used for trade.

Defendant sets forth twenty-two assignments of error in his appeal, each of which will be addressed in this opinion.

I.

[1] Defendant first assigns as error the trial court's ruling that defendant had the mental capacity to stand trial and to assist in

the preparation of his defense, notwithstanding defendant's apparent memory impairment or possible amnesia.

The trial court conducted a pre-trial hearing to determine Defendant Avery's capacity to proceed to trial or to plead to the fourteen indictments in question. At this hearing, forensic psychiatrists, Dr. Bob Rollins and Dr. Selwyn Rose, testified for the State and the defense respectively. Based on their separate interviews and examinations of defendant, Dr. Rollins and Dr. Rose agreed in their testimony that defendant was suffering from an impaired memory concerning the events at issue in the various indictments. Both psychiatrists also agreed that defendant was suffering from Chronic Post Traumatic Stress Disorder as a result of his service in the Vietnam War. At the time each forensic psychiatrist saw defendant, a portion of defendant's brain had already been removed in surgery as a result of his self-inflicted gunshot wound.

Dr. Rollins expressed the opinion that the portion of the brain removed controls affect and mood but has no significant effect on memory. It was Dr. Rollins' opinion that defendant had chosen not to remember the events of the allegations, that there was no evidence of organic brain damage or psychosis and that defendant had good memory of events before the week of the offenses and immediately after the offenses. In the opinion of Dr. Rollins, defendant was able to understand the nature and the object of the proceedings against him, was capable of assisting counsel in his defense, and was competent and capable to stand trial.

Dr. Rose expressed the opinion that defendant's memory impairment resulted from either organic brain damage or psychological repression. In the opinion of Dr. Rose, defendant did understand the nature and object of the proceedings against him but was unable to assist counsel in a rational manner in his defense because of memory impairment that prevented him from providing significant information about his behavior or mental state at the time of the commission of the alleged offenses.

At the conclusion of the hearing, the trial court made findings of fact and conclusions of law resolving conflicts in the testimony. The trial court found that although defendant's memory was impaired and his intellectual functions, judgment, and insight were limited, he was able to understand the nature and object of

the proceedings against him and comprehend his own situation in reference to those proceedings, and he was capable of assisting his attorneys in the preparation of his defense in a rational and reasonable manner. Based upon these findings of fact, the court concluded as a matter of law that pursuant to G.S. 15A-1001 defendant was capable of proceeding to trial.

In challenging this ruling, defendant urges this Court to adopt the rule that where the defense pleaded is insanity and the defendant's amnesia hampers preparation of his defense in a "crucial way" the defendant is then incompetent to stand trial or assist in the preparation of his defense. Defendant contends that where an accused suffers complete loss of memory of the events in question as here, he cannot rationally and reasonably consult with his defense counsel, or any expert psychiatric witness, concerning what he was thinking and feeling at the time of the transaction in question; nor can he testify in his own behalf before a jury as to a state of mind or what he was thinking or feeling. Furthermore, defendant contends that such a defendant is not able to give meaningful testimony in his own behalf on whether he understood right from wrong or could appreciate the nature and quality of his actions during the events in question, as required by the M'Naghten test for insanity recognized by North Carolina courts. We are not persuaded that such a rule for determining competency to stand trial should be adopted by this Court.

The law is clear in North Carolina with respect to determining a defendant's competency to stand trial and whether he is capable of assisting in his defense. As set out by this Court in *State v. Jenkins*, 300 N.C. 578, 268 S.E. 2d 458 (1980):

> G.S. 15A-1001(a) was enacted in 1973 providing in pertinent part:
>
> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.
>
> This statutory provision expresses a legislative intent to alter the existing case law governing the determination of

whether a defendant is mentally incapable of proceeding to trial. In contrast to our former case law, the new statute clearly sets forth in the disjunctive three tests of mental incapacity to proceed, and the failure to meet any one would suffice to bar criminal proceedings against a defendant. The statute does not, however, require the trial judge to make a specific finding that defendant is able 'to cooperate with his counsel to the end that any available defense may be interposed' . . . .

*Id.* at 582-83, 268 S.E. 2d at 462. Furthermore, in directly address-ing this issue, this Court has held that:

Obviously if defendant is unable to recall the events of the crime, his available defenses may be limited. We do not believe this fact alone renders him incompetent to stand trial or denies him a fair trial . . . . The general rule in other jurisdictions, which we adopt, is that amnesia does not *per se* render a defendant incapable of standing trial or of receiving a fair trial. (Citations omitted.) Partial amnesia places a defendant in no worse a position than the defendant who cannot remember where he was on a particular day because of the passage of time, or because he was insane, very intoxicated, completely drugged, or unconscious at the time. (Citation omitted.) In each of these cases, the defendant's available defenses may be limited or impaired because of his present inability to reconstruct a past period of his life.

*State v. Willard,* 292 N.C. 567, 576-77, 234 S.E. 2d 587, 593 (1977).

Applying the Court's previous reasoning to the case *sub judice,* we find no error in the trial court's ruling that defendant was competent to stand trial and to assist in his defense, notwithstanding his memory impairment.

II.

[2] Defendant next assigns as error the trial court's failure to dismiss the murder indictment against him insofar as it purported to allege first degree murder since such indictment did not allege each essential element of the offense of first degree murder, specifically premeditation and deliberation or felony murder. Defendant's indictment for murder charged the following:

The jurors for the State upon their oath present that on or about the date of the offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder RALPH A. GLENN.

The indictment complies with the short form indictment for murder authorized by G.S. 15-144, Essentials of bill for homicide, which provides:

In indictments for murder . . . it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed) . . . .

Defendant contends that G.S. 15-144, which was enacted in 1887, and prior case law were repealed by the enactment of G.S. 15A-924(a)(5) in 1973 and the adoption of Article I, § 23 of the Constitution of North Carolina, effective 1971. G.S. 15A-924(a)(5) provides that a criminal pleading must contain a factual statement that asserts facts supporting every element of a criminal offense. Article I, § 23 of the Constitution of North Carolina provides:

In all criminal prosecutions, every person charged with crime has the right to be informed of the accusation . . . .

Defendant concludes that G.S. 15A-924(a)(5) and Article I, § 23 of the Constitution of North Carolina implicitly repealed G.S. 15-144 and that an indictment for first degree murder must now specifically allege premeditation and deliberation or felony murder. We disagree.

Cases decided after the enactment of G.S. 15A-924(a)(5) and Article I, § 23 of the Constitution of North Carolina have upheld indictments drawn in compliance with G.S. 15-144. In *State v. Norwood*, 303 N.C. 473, 279 S.E. 2d 550 (1981), this Court held that the short form indictment for murder allows the State to prove both premeditation and deliberation and felony murder. In *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), we held that the short form indictment for murder meets the requirements of due process of both the United States and the North Carolina Constitutions. In *State v. Wall*, 304 N.C. 609, 286 S.E. 2d 68 (1982), this Court found no error and noted that "[d]efendant was tried under an indictment drawn pursuant to the

provisions of G.S. 15-144." *Id.* at 620, 286 S.E. 2d at 75. In *State v. Melton*, 307 N.C. 370, 298 S.E. 2d 673 (1983), we held that a short form murder indictment complying with the requirements of G.S. 15-144 would support a conviction of first degree murder. In *State v. Hinson*, 310 N.C. 245, 311 S.E. 2d 256 (1984), we held that the murder indictment "appears in the form approved by G.S. 15-144 and is in all respects proper." *Id.* at 250, 311 S.E. 2d at 260.

These cases are consistent with the principles of statutory construction. Article I, § 23 of the Constitution of North Carolina and G.S. 15A-924(a)(5) did not specifically repeal G.S. 15-144 nor did they repeal it by implication. The above cases reaffirm prior case law and uphold the validity of indictments drawn in conformity with G.S. 15-144. The indictment in question complies with the short form indictment authorized by G.S. 15-144 and is therefore sufficient to charge first degree murder without specifically alleging premeditation and deliberation or felony murder.

### III.

[3] In his third assignment of error, defendant contends that the trial court denied him his fourteenth and sixth amendment rights by denying his motion to quash the petit jury venire and the indictments against him. By this assignment, defendant first argues he was denied equal protection under the fourteenth amendment because of systematic exclusion of non-whites from the jury pool from which the grand jury was drawn. Defendant next argues that the pool from which the petit jury was selected did not contain an adequate number of non-whites to reflect a fair cross-section of the community, thus depriving him of rights secured to him by the sixth amendment. For the reasons that follow, we find no error in the trial court's denial of defendant's motions.

For the 1982-83 biennium, the Durham County Jury Commission used the county voter registration list, as prescribed by G.S. 9-2,[1] exclusively as a master jury list. This list was given to the register of deeds who fed the list through a computer, which randomly selected the jury list from which the grand jury and the

---

1. The current version of the statute requires that the list of licensed drivers residing in the county also be used in preparing the jury list. N.C. Gen. Stat. § 9-2 (c) (1981).

petit jury venire were drawn. The jury commission then purged this list of deceased persons and incompetents.

Dr. James H. O'Reilly, a sociologist who was qualified as an expert witness in the fields of statistics and demography, as those fields are applied to composition of jury pools, testified for the defense. His testimony focused on various methods used to analyze whether a recognized group of persons, such as non-whites, are excluded in significant numbers from pools from which grand or petit juries are selected. At the conclusion of the presentation of the evidence, the trial court concluded that the case *sub judice* was governed by this Court's decision in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980), where we held that the Mecklenburg County Jury Commissioners had complied with G.S. 9-2 in the preparation of the jury list and that there was no subjective or discriminatory selection of jurors by the commissioners. The trial court further stated that "the statistical figures offered by the defendant did not establish an unfair cross-section in violation of the sixth and fourteenth amendments, and that if they did, there was no evidence of any systematic exclusion on the part of the jury commission within the meaning of the law."

Fourteenth and sixth amendment challenges to jury selections were extensively considered by this Court in *State v. Avery*, which governs the case *sub judice* based on the similarity of the essential facts. The Court noted in *Avery*, "[A] conviction cannot stand if it is based on a grand jury or a verdict of a petit jury from which Negroes were excluded by reason of their race." *Id.* at 129, 261 S.E. 2d at 806 (quoting *Whitus v. Georgia*, 385 U.S. 545 (1967)); *see also State v. Spencer*, 276 N.C. 535, 173 S.E. 2d 765 (1970); *State v. Ray*, 274 N.C. 556, 164 S.E. 2d 457 (1968). However, the defendant "is not entitled to a jury of any particular composition, nor is there any requirement that the jury actually chosen must mirror the community and reflect various and distinctive population groups." *Avery*, 299 N.C. at 130, 261 S.E. 2d at 806 (citations omitted).

On the defendant's fourteenth amendment right to be free from racial discrimination, the *Avery* Court noted that:

[T]he fact that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbid-

State v. Avery

den by the [equal protection] clause. 'A purpose to discrimi-
nate must be present which may be proven by a systematic
exclusion of eligible jurymen of the prescribed race, or by
unequal application of the law to such an extent as to show
intentional discrimination.'

*Id.* at 130, 261 S.E. 2d at 806 (citations omitted).

The *Avery* Court held that the defendant had failed to show
a discriminatory purpose on the part of the jury commission
where Blacks constituted twenty-four percent of the population of
the county, the use of voter registration and tax lists in selecting
the jury resulted in a jury pool with fifteen percent Blacks, and a
computer randomly selected every second, fourth, eighth, twelfth
and fifteenth name from the master jury list, since there was only
a nine percent deviation between the percentage of Blacks in the
county and the percentage of Blacks in the jury pool, and there
was no subjective or discretionary selection of jurors by the Jury
Commissioners. *Id.* at 130-31, 261 S.E. 2d at 806-07.

In the case *sub judice*, non-whites constitute 35.9 percent of
the eligible population in Durham County for service on a jury.
The county voter registration list was used as a master jury list
from which a computer randomly selected the jury pool.[2] The jury
pool was then purged of deceased and incompetent persons. The
result was a jury pool with 26.3 percent non-whites. This result
represents a 9.6 deviation, only .6 percent above the result found
in *Avery*. There was also no evidence in the record of subjective
or discretionary selection by the Durham County Jury Commis-
sion. Thus the trial court correctly concluded that there was in-
sufficient evidence of systematic exclusion of non-whites from the
jury venire or unequal application of the law to such an extent as
to show intentional discrimination as required to constitute an
equal protection violation under the fourteenth amendment.

Regarding the defendant's sixth amendment challenge, the
United States Supreme Court has held that the selection of a
petit jury from a representative cross-section of the community is

2. Effective 1 July 1983, the list of licensed drivers residing in the county is a
required source of names for use by the commission in preparing the jury list. N.C.
Gen. Stat. 9-2(c). Dr. O'Reilly testified that by merging the voter and licensed
drivers list "you get a more inclusive master list."

an essential component of the right to a jury trial. *Taylor v. Louisiana*, 419 U.S. 522 (1975). In *Duren v. Missouri*, 439 U.S. 357 (1979), the Court held that to establish a prima facie violation of the fair cross-section requirement, the defendant must show: "(1) that the group alleged to be excluded is a distinctive group; (2) that the representation of the group within the venire is not fair and reasonable with respect to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion in the jury selection process." *Id.* at 364.

Following the *Avery* analysis in applying the *Duren* test to the case *sub judice*, "the defendant satisfies the first requirement for Negroes are an identifiable class." *Avery*, 299 N.C. at 134, 261 S.E. 2d at 808 (citation omitted). As in *Avery*, however, the defendant here has failed to establish a prima facie case with respect to requirements 2 and 3 of the *Duren* test. In both *Taylor* and *Duren*, the Court found that the female defendants' sixth amendment rights had been violated where the disparity between the female population in the community and the women in the jury pool exceeded thirty-five percent. *Id.* at 134, 261 S.E. 2d at 808. In *Avery*, this Court found no violation where disparity totaled nine percent.[3] Here the disparity totaled only 9.6 percent.[4] As noted in *Avery*, the *Taylor* Court stated that the fair cross-section requirement must have much leeway in its application. In *Duren*, the Court noted a gross discrepancy between the percentage of women in the jury venire and the percentage of women in the community. Here, as in *Avery*, it does not appear that the defendant has presented evidence showing a gross discrepancy comparable to the cases where a violation has been found. On the contrary, the evidence is substantially similar to that found by this Court in *Avery* to be insufficient to establish a sixth amendment violation. Thus we reject defendant's fourteenth and sixth amendment challenges to the grand jury and petit jury venire.

3. No sixth amendment violation was found in *State v. Price*, 301 N.C. 437, 272 S.E. 2d 103 (1980) where the absolute disparity was fourteen percent.

4. This figure represents the absolute disparity for the 1982-83 biennium and is considered more accurate than the disparity figure of 10.1 percent testified to by Dr. O'Reilly for the venire used for a much shorter period (1 June through 9 June 1983).

## IV.

**[4]** Defendant's next assignment of error challenges the long-standing common-law rule in North Carolina that insanity is an affirmative defense which must be proved by the defendant. *See State v. Heptinstall*, 309 N.C. 231, 237, 306 S.E. 2d 109, 112 (1983); *State v. Wetmore*, 298 N.C. 243, 245, 259 S.E. 2d 870, 872 (1979); *State v. Caldwell*, 293 N.C. 336, 339, 237 S.E. 2d 742, 744 (1977). By this assignment, defendant urges this Court to reexamine and overrule our precedents on this issue and adopt the rule of twenty-eight states which place the burden of disproving insanity on the prosecution. *See Patterson v. New York*, 432 U.S. 197, 208, n. 10 (1977).

The defendant in *Heptinstall* made a similar request and the Court declined to change the rule. *Heptinstall*, 309 N.C. at 237, 306 S.E. 2d at 112. As did the *Heptinstall* Court, we continue to believe our rule to be the better view, while recognizing that reasonable arguments can be made to the contrary. We again decline to change the rule and hold that the trial court did not err in placing the burden on defendant to prove his insanity.

## V.

Defendant makes two arguments in his next assignment of error. He first contends the trial court improperly denied his pretrial motion to prohibit "death qualification" of the jury. He then contends that during jury *voir dire*, the trial court improperly excused twelve jurors based on their beliefs concerning the death penalty.

**[5]** Defendant argues that the pretrial "death qualification" violated his rights to due process and a trial by a jury drawn from a representative cross-section of the community. This argument has been consistently rejected by this Court. *See e.g., State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (1984); *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984); *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984); *State v. Hinson*, 310 N.C. 245, 311 S.E. 2d 256 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983); and *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980). Defendant here advances no new evidence or argument which merits our reconsideration of the well-established principles set forth in the above cited cases. The motion was properly denied.

[6] Defendant's second argument contends that the trial court's excusal of twelve potential jurors for cause based on their answers during the pretrial "death qualification" violated the principles established in *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In addressing this issue we recently noted that:

> *Witherspoon* permits the exclusion for cause of a juror if it is established that the juror 'would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case. . . .' 391 U.S. at 522, n. 21 (emphasis in original). The North Carolina statute which sets forth the grounds for challenging a juror for cause, G.S. 15A-1212, adopts the *Witherspoon* test as the basis for excluding jurors who '[a]s a matter of conscience, regardless of the facts and circumstances,' would be unable to return a verdict imposing the death penalty.

*State v. Gardner*, 311 N.C. 489, 500, 319 S.E. 2d 591, 599 (1984).[5]

In the case *sub judice*, each of the twelve jurors indicated that they could not vote for the death penalty under any circumstances. We conclude that the jurors were properly excused for cause under the requirements of *Witherspoon* and G.S. 15A-1212(8).

## VI.

Defendant's next three assignments of error challenge the trial court's use of its discretion in regulating defendant's questioning of prospective jurors regarding the insanity defense; in excusing five prospective jurors for cause; and in regulating defendant's examination of a prospective juror to determine whether he had been prejudiced by opinions expressed to him concerning defendant's guilt.

[7] Regarding the insanity defense, defendant attempted to question two jurors to determine if they had any impermissible bias against an insanity defense. The trial court did not allow defendant's questioning. Defendant contends that the trial court's failure

---

5. While the United States Supreme Court has "clarified" the *Witherspoon* test, *Wainwright v. Witt*, 105 S.Ct. 844 (1985), the "clarification" does not appear to be inconsistent with G.S. 15A-1212.

to permit the questioning denied defendant his right to establish potential challenges for cause and to intelligently exercise his peremptory challenges. We cannot agree.

Defendant asked the first juror in question if he knew what a dissociative episode was and whether he believed "that it is possible for a person not to know because of some mental disorder where they actually are, and do things that they believe they are doing in another place and under circumstances that are not actually real?" Defendant asked the second juror in question if she was thinking, "well, if [defendant] says he has PTSD, for that reason alone I would vote that he is guilty."

It is well established that: "In this jurisdiction counsel's exercise of the right to inquire into the fitness of jurors is subject to the trial judge's close supervision. The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion. [Citation omitted.] The overwhelming majority of the states follow this rule." *State v. Bryant*, 282 N.C. 92, 96, 191 S.E. 2d 745, 748 (1972), *cert. denied*, 410 U.S. 987 (1973); *accord State v. Carey*, 285 N.C. 497, 506, 206 S.E. 2d 213, 220 (1974). "A defendant seeking to establish on appeal that the exercise of such discretion constitutes reversible error must show harmful prejudice as well as clear abuse of discretion." *State v. Young*, 287 N.C. 377, 387, 214 S.E. 2d 763, 771 (1975) (citations omitted). This Court also has noted that "the court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts." *State v. Vinson*, 287 N.C. 326, 336, 215 S.E. 2d 60, 68 (1975). Nevertheless this Court recognizes that "in certain cases appropriate inquiry may be made in regard to whether a juror is prejudiced against the defense of insanity. . . ." *Id.* at 338, 215 S.E. 2d at 69.

We have reviewed defendant's contention under the circumstances here presented and find no abuse of discretion. It was within the trial court's discretion to determine whether the questions were improper in that they were hypothetical and tended to "stake out" the jurors and cause them to pledge themselves to a future course of action at a stage of the trial where no evidence had been presented and no instructions had been given on the applicable law.

## VII.

**[8]** Defendant next contends that the trial court abused its discretion in excusing five prospective jurors for cause based on reasons which are not legal justifications for excuse, thereby violating his rights under the sixth and fourteenth amendments to the United States Constitution and article I, §§ 19, 24, and 35 of the North Carolina Constitution. The jurors in question were five of more than 150 prospective jurors examined during the three week jury selection process. The trial court excused the five for reasons of employment, conflicts, religious opinion, opposition to the death penalty, and potentially prejudicial knowledge of the defendant's parole opportunity if convicted. The trial judge "has the duty to supervise the examination of prospective jurors and to decide all questions relating to their competency." *State v. Young*, 287 N.C. at 387, 214 S.E. 2d at 771. He has broad discretion "to see that a competent, fair and impartial jury is empaneled and rulings of the trial judge in this regard will not be reversed absent a showing of abuse of discretion." *State v. Johnson*, 298 N.C. 355, 362, 259 S.E. 2d 752, 757 (1979). *Accord State v. Phillips*, 300 N.C. 678, 268 S.E. 2d 452 (1980). We find no abuse of discretion.

## VIII.

**[9]** Defendant further contends that the trial court abused its discretion in refusing to allow defendant to elicit from a juror the opinion expressed to the juror by friends about the defendant's guilt or innocence. The defendant exercised a peremptory challenge and removed the juror after his challenge for cause was denied. Defendant was entitled to fourteen peremptory challenges plus one additional peremptory challenge for each alternate juror. N.C. Gen. Stat. § 15A-1217 (1983). Defendant only exercised twelve peremptory challenges during selection of the first twelve jurors and two peremptory challenges during selection of the three alternate jurors. Thus, defendant did not exhaust his peremptory challenges as provided by G.S. 15A-1214(h). Therefore, no prejudice has been shown. *See Young*, 287 N.C. at 389, 214 S.E. 2d at 772. We conclude that the trial court did not abuse its discretion.

## IX.

Defendant's ninth assignment of error is directed to the trial court's refusal to dismiss three of the four felonious entry charges, two of the three felonious burning charges, and the first degree murder charge at the close of the State's evidence and again at the close of all the evidence, on the basis of the insufficiency of the evidence to support convictions in these cases. Defendant was subsequently convicted of all charges. However, the trial court arrested judgment on one of the felonious burning offenses, holding as a matter of law that the conviction for this offense merged into the murder case under the felony murder rule.

The evidence presented at trial tended to show that defendant entered the IBM Complex through the loading dock of Building 205. While in Building 205, defendant burned or attempted to burn that building. Defendant then exited Building 205 via a passageway which connects Buildings 205 and 201. The passageway is about twenty-five feet wide, totally enclosed, and used for production and pedestrian traffic between the two buildings. No door or barrier seals off either Building 205 or Building 201 from this connecting passageway which links the two buildings. Defendant then entered Building 201 where he fatally shot IBM employee Ralph Glenn and burned or attempted to burn Building 201. Defendant next entered Building 303 which was built as an extension of Building 201. A wall of Building 303 is butted against a wall of Building 201. The buildings are connected by a sliding door which always remains open, except in the event of a fire emergency. Defendant finally entered Building 203 via a passageway similar to the one described above which connects Buildings 205 and 201. Defendant burned or attempted to burn Building 203 before exiting the IBM Complex.

## A.

[10] Defendant makes three arguments in this assignment. First, defendant argues that the trial court erred in failing to dismiss the multiple charges against him of felonious entry. Defendant contends that the IBM Complex is but a single structure or building whose various parts are identified by different numbers for administrative convenience, and are connected by passageways with neither doors nor any other barriers to impede access to all parts of the facility once entry is gained. The State contends that

the buildings in question constitute four separate buildings in that they were not all built at the same time, are only connected by the passageways and a sliding door, are separately secure to someone entering from the outside, and each possesses a separate character and individual identity. The trial court found the separate indictments proper and refused to dismiss three of the four felonious entry charges.

The specific argument raised here is one of first impression in this State. Its resolution must be the result of our interpretation of the legislative intent of the meaning and limitations of the term "building" as that term is used in G.S. 14-54 which reads as follows:

> (a) Any person who breaks or enters any *building* with intent to commit any felony or larceny therein shall be punished as a Class H felon.

> (b) Any person who wrongfully breaks or enters any *building* is guilty of a misdemeanor and is punishable under G.S. 14-3(a).

> (c) As used in this section, "building" shall be construed to include any dwelling, dwelling house, uninhabited house, building under construction, building within the curtilage of a dwelling house, *and any other structure* designed to house or secure within it any activity or property.

(Emphases added.)

The dispositive question for our review is whether it was the intent of the legislature that several connected buildings, constructed at different times, and treated as separate buildings by those using them, with separate building numbers, should nevertheless be treated as only one building under the above statute because the buildings are connected by passageways that permit unrestricted access from one building to the other. The only case cited by defendant is *State v. Gamble*, 56 N.C. App. 55, 286 S.E. 2d 804 (1982). In that case, the Court of Appeals determined that a fenced-in area is not a building as that term is used in G.S. 14-54. The opinion further noted the common definition of "building" as

> a constructed edifice designed to stand more or less permanently, covering a space of land, usu. [sic] covered by a

> roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—distinguished from structures not designed for occupancy (as fences or monuments) . . . .

> Webster's Third New International Dictionary (1968 ed.) 292. The 'particular designations' in the G.S. 14-54(c) definition of 'building,' 'dwelling, dwelling house, uninhabited house, building under construction, building within the curtilage of a dwelling house,' indicate that the legislature intended the statute to proscribe breaking or entering into that which conforms to the common definition. The statutes predating the present G.S. 14-54 also support this construction of its coverage, restricting the statute to that which has—or is intended to have—one or more walls and a roof.

*Id.* at 58-59, 286 S.E. 2d at 806.

We find nothing in the Court of Appeals' decision in *Gamble* to support defendant's contention that the IBM Complex involved in this case should be treated as one building rather than four. The case supports the proposition rather, that the word "building" should be given its common and usual meaning. We conclude that the trial court correctly treated the IBM Complex as four separate buildings. Accordingly, we reject defendant's contention that three of the four indictments for felonious entry must be dismissed because only one building was involved.

### B.

[11] Defendant also contends that even if the Court finds that the buildings enumerated in the separate burning charges are separate buildings the evidence was insufficient to withstand his motion to dismiss the count alleging a burning of Building 201. Defendant argues that because G.S. 14-62 does not define the term "set fire to or burn or cause to be burned" the State was required to prove a "burning" as that term has been defined in arson cases. Defendant further argues that the evidence does not establish such a "burning," and therefore the motion to dismiss should have been granted. Although defendant was indicted for feloniously setting fire to Building 201, the jury only convicted him of the lesser included offense of *attempting* to set fire to or burn said building, a violation of G.S. 14-67.1. The trial court ruled as a matter of law that this conviction merged with the murder conviction under the felony murder rule.

A conviction under G.S. 14-67.1 does not require that the State prove a "burning" as is required under the arson statute and the common law. *See State v. Oxendine*, 305 N.C. 126, 286 S.E. 2d 546 (1982). It requires that a defendant willfully and wantonly *attempt* to set fire to or burn any building or structure. The definition of attempt is "to make an effort to do, accomplish, solve . . . ." Webster's Third International Dictionary 140 (3d ed. 1971). The evidence here clearly shows that defendant attempted to burn Building 201. Defendant ignited a fire bomb in Building 201 which caused some blackening of the floor tile, a steel cabinet and an office partition. Some burned matches were also found in Building 201. Defendant concedes that this burning occurred but he claims that it was insufficient evidence to support a conviction under G.S. 14-62. Since defendant was convicted under G.S. 14-67.1, his argument is without merit. We hold that the evidence was sufficient to support a conviction for attempting to set fire to or burn a building under G.S. 14-67.1. We find no error.

Defendant next argues that the trial court erred in failing to dismiss two of the three felonious burning charges against him. Defendant bases this argument on his contention that the IBM Complex is a single building. Under the facts of this case, we find no compelling reason to distinguish between the word "building" as used in the felonious entry statutes and the same word as used in the felonious burning statutes. Accordingly, we reject defendant's assignment of error.

C.

Defendant's final argument under this assignment is that his conviction of first degree murder predicated on the felony murder rule should not be allowed to stand because the underlying felony, burning of a building used for trade (Building 201) should have been dismissed. As stated earlier, there was sufficient evidence to go to the jury and sustain a jury verdict of guilty of attempting to set fire to or burn a building in violation of G.S. 14-67.1. This is a felony conviction and therefore it is available to serve as the underlying felony under the felony murder rule.

[12] Defendant next contends that the felony for which he was convicted, attempting to set fire to a building used for trade as set forth in G.S. 14-67.1, is not a felony within the meaning of G.S. 14-17 under the facts of the present case because it is not a listed felony and this felony did not "cause" the victim's death. G.S. 14-17 provides in pertinent part that:

A murder . . . which shall be committed in the perpetration or attempted perpetration of any . . . other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree . . . .

We believe that the fire bombs used by defendant were deadly weapons used in the perpetration of the felony of attempting to burn a building used for trade, and that the killing of the victim in question was in the perpetration of this felony within the meaning of G.S. 14-17. Furthermore, the law is clear in this State that a killing is committed in the perpetration or attempted perpetration of a felony for the purpose of the felony murder rule when there is no break in the chain of events leading from the initial felony to the act causing death. *State v. Rinck*, 303 N.C. 551, 280 S.E. 2d 912 (1981). An interrelationship between the felony and the homicide is a prerequisite to the application of the felony murder rule. *State v. Strickland*, 307 N.C. 274, 291-94, 298 S.E. 2d 645, 657-58 (1983); *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). We hold that the evidence was sufficient to establish that defendant killed Ralph Glenn in the perpetration of the felony of attempting to burn Building 201, a felony committed with the use of a deadly weapon, a fire bomb.

## X.

[13] We next consider defendant's contention that the trial court erred by limiting defendant's cross-examination of the State's rebuttal witness, Dr. Owen Buck. Dr. Buck, a psychiatrist who was qualified as an expert witness, testified that defendant's violent outburst did not "fit with the literature about Post Traumatic Stress Disorder (PTSD) types of outburst," thereby rebutting previous defense testimony that defendant's behavior was consistent with the PTSD mold. On cross-examination, defendant sought to impeach Dr. Buck's testimony by showing his apparent unfamiliarity with the literature about PTSD. The court permitted defendant to question Dr. Buck extensively on his familiarity with the literature but the court refused to permit defendant to ask Dr. Buck questions of his familiarity with the facts of certain criminal cases involving the PTSD defense. Defendant argues that it was reversible error for the trial court to limit his cross-examination of Dr. Buck in that he was thereby deprived of his constitutional right to confront and cross-examine witnesses against him. For the following reasons we disagree.

Although the range of relevant cross-examination is very broad, *State v. Newman*, 308 N.C. 231, 302 S.E. 2d 174 (1983), and a witness in a trial may be impeached and discredited by cross-examination, *State v. Wilson*, 311 N.C. 117, 316 S.E. 2d 46 (1984), the trial court's rulings on objections to the extent of cross-examinations will not be held in error in the absence of a showing that the verdict was improperly influenced by the limited scope of the cross-examination. *Id.* at 128, 316 S.E. 2d at 54. Defendant was permitted to conduct an extensive cross-examination on Dr. Buck's familiarity with the PTSD literature. This cross-examination provided ample opportunity for the jury to form an opinion of Dr. Buck's actual familiarity with the PTSD literature. Therefore, we believe that the verdict was not improperly influenced by the trial court's limitation of defendant's cross-examination of Dr. Buck.

## XI.

[14] Defendant next assigns error to the trial court's admitting into evidence over defendant's objection and *motion in limine* certain exhibits which tended to impeach previous testimony by defendant that he had not engaged in certain prior "bad acts," to wit: misuse of trust fund monies belonging to the children of his deceased brother.

At trial, defendant called as a witness his mother, Thelma Avery, who testified in response to defendant's questioning that he had not been involved in any court action involving his brother's children, and that there had never been any allegations that defendant had misused any money of these children. Subsequently, on cross-examination, defendant also denied any involvement or knowledge of such a court action. On rebuttal, the State introduced written exhibits which tended to show *inter alia* that defendant had requested that he be allowed to be absent from work to attend a court action regarding his alleged misuse of his brother's children's trust fund money.

On a similar assignment, a majority of this Court found no error where the trial court had allowed the State to introduce evidence of a defendant's drug conviction after defendant had put his parole officer on the witness stand in his behalf. *State v. Brown*, 310 N.C. 563, 313 S.E. 2d 585 (1984) (Exum, J. and Frye, J., dissenting). In *Brown* it was stated that:

The basis for the rule commonly referred to as 'opening the door' is that when a defendant in a criminal case offers

evidence which raises an inference favorable to his case, the State has the right to explore, explain, or rebut that evidence. *State v. Albert*, 303 N.C. 173, 277 S.E. 2d 439 (1981).

*Id.* at 571, 313 S.E. 2d at 590. While the dissenting opinion in *Brown* disagreed with the applicability of the rule to the facts of the case, there was no disagreement as to the principle involved. This principle is explained in the case of *State v. Albert*, 303 N.C. 173, 277 S.E. 2d 439 (1981) as follows:

> [T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially. *State v. Patterson*, 284 N.C. 190, 200 S.E. 2d 16 (1973); *State v. Black*, 230 N.C. 448, 53 S.E. 2d 443 (1949).

*Id.* at 177, 277 S.E. 2d at 441.

In the case *sub judice* we believe defendant "opened the door" to the facts surrounding his involvement in the alleged court action with his mother's testimony. Therefore, it was not error to admit evidence in rebuttal of defendant's later testimony on this issue.

## XII.

[15] Defendant next contends that the trial court erred in refusing to allow defendant's surrebuttal witness, Gordon Commodore, to testify concerning the length of his own "flashbacks" concerning Vietnam. Defendant argues that the testimony would have rebutted the State's favorable psychiatric testimony that dissociative episodes related to PTSD were of limited duration and therefore were not consistent with defendant's conduct at the time of his offenses. After careful review of the record, which contains the testimony of Mr. Commodore taken in the absence of the jury, we find no merit in this assignment of error. The witness was not qualified as an expert and no expert testimony was introduced to show that he had PTSD. The witness testified

that he was using drugs prior to his alleged extended dissociative episode. This could have had an impact on his condition and at the very least makes his case factually different on this issue from this defendant's case. Finally, Dr. Buck and Dr. Walker, who provided the psychiatric testimony in question for the State, did not testify that extended dissociative episodes related to PTSD were impossible; they merely stated that such episodes were not generally consistent with PTSD.

The probative value of defendant's witness' testimony is questionable in light of these facts. we believe the testimony's value to defendant did not outweigh the potentially prejudicial and confusing effect it might have had on the jury. We find no error.

## XIII.

[16] Defendant argues that the trial court erred in refusing to submit to the jury the lesser included offense of involuntary manslaughter. Since no one actually saw defendant shoot Ralph Glenn, defendant contends that he could have killed Mr. Glenn in a criminally negligent manner which would have supported submission of such lesser included offense to the jury.

Defendant was tried under an indictment drawn pursuant to the provisions of G.S. 15-144. The trial judge, as is permitted by that statute, submitted to the jury the possible verdicts of (1) guilty of first degree murder under either of the theories of malice, premeditation and deliberation or the felony murder rule; (2) guilty of second degree murder; and (3) not guilty. *See State v. Wall*, 304 N.C. 609, 286 S.E. 2d 68 (1982). The jury returned a unanimous verdict of guilty of first degree murder under the felony murder rule. The jury found defendant not guilty of first degree murder based on malice, premeditation, and deliberation.

It is well established that when evidence shows the killing of a person by one who is engaged in the perpetration or the attempt to perpetrate a felony described in G.S. 14-17, the perpetrator may properly be charged and convicted of murder in the first degree notwithstanding such person's intentions or conduct. *See State v. Cawthorne*, 290 N.C. 639, 277 S.E. 2d 528 (1976); *see also State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1971). Furthermore, "when the law and evidence justify the use of the

felony murder rule, then the State is not required to prove premeditation and deliberation, and neither is the court required to submit to the jury second-degree murder or manslaughter unless there is evidence to support it." *State v. Wall*, 304 N.C. at 613, 286 S.E. 2d at 71. In the case *sub judice*, there is no evidence to support submission of involuntary manslaughter as a lesser included offense. There was no error in failing to submit this offense to the jury.

## XIV.

Defendant contends that the trial court erred in instructing the jury on the proximate cause element of the felony murder rule. Defendant argues that the instructions should have required the jury to find that the proximate cause of the victim's death was the burning or attempt to burn the building in question rather than the shooting of the victim by a .45 caliber weapon. This assignment is based on defendant's earlier argument that the felony murder rule is not applicable to this case. We have rejected that argument and therefore find it unnecessary to address this assignment further.

## XV.

[17] Defendant next contends that his two convictions of assault with a firearm on a law enforcement officer cannot stand because of the failure of the trial judge to instruct the jury, upon his request, that in order to convict him of this offense the jury must find that defendant knew that he was firing at a law enforcement officer. Defense counsel contended at the trial that knowledge that the victim is a law enforcement officer in the performance of his duties is an essential element of the crime of assault with a firearm upon a law enforcement officer in violation of G.S. 14-34.2 and requested the court to so instruct the jury. The trial court refused and defendant objected.

While our research has disclosed no decision of this Court deciding this specific question, defendant cites for our consideration the decision of the Court of Appeals in *State v. Rowland*, 54 N.C. App. 458, 283 S.E. 2d 543 (1981). In that case, the Court of Appeals held that in order to obtain a conviction under G.S. 14-33(b)(4), the burden is on the State to satisfy the jury from the evidence and beyond a reasonable doubt that the party assaulted

was a law enforcement officer performing the duty of his office, and that the defendant knew his victim was a law enforcement officer. The State urges this Court to overrule *State v. Rowland* and adopt the view that knowledge that the victim is a law enforcement officer is not an element of the offenses proscribed by G.S. 14-34.2 or G.S. 14-33(b)(4). While the offense in the former case is a felony and in the latter case a misdemeanor, the essence of both statutes, we believe, is the legislative intent to give greater protection to the law enforcement officer by prescribing a greater punishment for one who knowingly assaults such an officer.

We note that the Pattern Jury Instructions for offenses in violation of both G.S. 14-34.2 and G.S. 14-33(b)(4) require not only that the jury find that the victim was a law enforcement officer but also that the defendant "knew or had reasonable grounds to know" that the victim was a law enforcement officer. N.C.P.I., Crim. 208.80 (June 1985), Crim. 208.95 (October 1984). We believe that such a requirement is in accord with the purpose and intent of the General Assembly in enacting this legislation. Thus, we hold that knowledge is an essential element of the crime of assault with a firearm upon a law enforcement officer. *State v. Rowland*, 54 N.C. App. 458, 283 S.E. 2d 543; *see also State v. Atwood*, 290 N.C. 266, 225 S.E. 2d 543 (1976).

"In giving instructions the court is not required to follow any particular form and has wide discretion as to the manner in which the case is presented to the jury, but it has the duty to explain, without special request therefor, each essential element of the offense and to apply the law with respect to each element to the evidence bearing thereon." *State v. Mundy*, 265 N.C. 528, 529, 144 S.E. 2d 572, 573 (1965). Knowledge being an essential element of the crime, the failure of the trial judge to instruct on this element must be held to be prejudicial error. *Id.* Therefore, defendant's convictions for assault with a firearm upon a law enforcement officer must be vacated. However, as the State correctly contends, by finding the defendant guilty of felonious assault upon a law enforcement officer, the jury necessarily found the facts that would support defendant's conviction of the lesser included offenses of assault with a deadly weapon. *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (1980); *State v. Rushing*, 61 N.C. App. 62, 300 S.E. 2d

445 (1983). Accordingly, these cases will be remanded to permit resentencing on the charge of assault with a deadly weapon.

## XVI.

Defendant next assigns as error that the trial court erred in its definition of "setting fire" to property in requiring only that defendant cause fire to come into contact with the property. Since defendant was only convicted of attempting to set fire to or burn a building, we fail to see how defendant was prejudiced by the trial court's instruction. Thus, we reject this assignment of error.

## XVII.

[18]   Defendant next contends that the trial court erred in failing to explain to the jury what proof of insanity to the jury's satisfaction means under North Carolina law. Defendant specifically objects to that portion of the trial court's charge that, "if you are in doubt as to the insanity of the defendant, the defendant is presumed to be sane and you would find the defendant guilty." The trial court instructed the jury that the burden of proving insanity rested upon defendant and that it was defendant's burden to satisfy them of his insanity but not beyond a reasonable doubt. The court further instructed the jury that even if the State proved beyond a reasonable doubt each of the things which it is required to prove about each offense, "the defendant would nevertheless be not guilty if he was legally insane at the time of the alleged offense." Defendant contends that the challenged portion of the jury instruction conveyed to the jury that defendant was "required to overcome all doubt on this issue."

The trial court in the case of *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1984), charged the jury in almost the identical language used by the trial court in the instant case. This Court, in an opinion written by Chief Justice Branch, held that there was no prejudicial error in the instruction. For the reasons stated in *Adcock*, we reject defendant's assignment of error.

## XVIII.

[19]   Defendant's eighteenth assignment of error is that the trial court erred in refusing to instruct the jury substantially in accord with defendant's requested instructions Numbers 6 and 8. Defendant's requested instructions pertain to the concepts of

general criminal intent or *mens rea*, specific intent and willfulness.

Neither statutory nor case law requires that the trial court's charge be given exactly in the words of the tendered request for instructions. It is sufficient if the trial court gives the requested instructions in substance. *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981); *State v. Matthews*, 299 N.C. 284, 261 S.E. 2d 872 (1979); *State v. Monk*, 291 N.C. 37, 229 S.E. 2d 163 (1976). A review of the charge in the present case reveals that the court gave instructions substantially in accord with defendant's request but only insofar as the requested instructions were a correct statement of the law and proper in the context of this case.

## XIX.

[20] Defendant next contends that the trial court erred when sentencing him on the non-capital felony cases by finding as an aggravating factor that defendant was a mentally abnormal person and then utilizing such fact to impose a sentence greater than the presumptive sentence. In each of the non-capital cases, other than the one which was arrested because the trial court held that it merged into the felony murder case, the trial court found as an aggravating factor the following:

> The defendant is a dangerous and mentally abnormal person whose commitment for an extended period of time is necessary for the protection of the public and society at large.

Essentially, defendant contends that utilizing the above factor to impose a sentence greater than the presumptive term amounts to using his mental illness to enhance punishment, thus depriving him of his right not to be subjected to cruel and unusual punishment under the eighth and fourteenth amendments to the Constitution of the United States and Article I, § 23 of the Constitution of North Carolina.

We interpret the court's finding as not punishing defendant for being mentally ill; *see Robinson v. California*, 370 U.S. 666 (1962), but as a finding that defendant was abnormal in the sense of being unusually dangerous. In *State v. Higson*, 310 N.C. 418, 424, 312 S.E. 2d 437, 441 (1984), this Court held that "defendant's long history of mental disorder, coupled with the testimony of the expert witnesses at trial and the violent attack on his family

members, sufficiently demonstrates his dangerousness to others." The Court held that it was therefore proper for the trial court to find this factor (extremely dangerous abnormal person) in aggravation. In *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689 (1983), this Court held that the trial court did not err in finding as an aggravating factor that defendant was dangerous to others when defendant suffered from a physical handicap, as well as social and emotional problems, and his condition manifested itself in the form of serious antisocial behavior and criminal acts.

In the case *sub judice*, the trial court's finding that defendant is a dangerous and mentally abnormal person is supported by the evidence. The evidence showed that defendant suffered from a mental disorder—PTSD—at the time of the incident at the IBM Complex for which he was convicted. The expert testimony also revealed that there are strong indications that defendant has psychotic potential when he is under emotional stress. Since the evidence supports the conclusion that defendant is a dangerous and mentally abnormal person, we find no error in the trial court's finding of this factor in aggravation.

[21] Defendant also contends that assuming the trial court's finding that he is a dangerous and mentally abnormal person was proper, it was not tailored to each offense. By this, defendant argues that the trial court mechanically recited the same aggravating factor in each of the felony judgments and commitments without giving consideration to the specific offense being punished. The record reveals that the trial court made a separate finding for each crime in accordance with the rule stated in *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689. We find no error.

## XX.

[22] Defendant next challenges the trial court's finding that defendant is a dangerous and mentally abnormal person and the finding that defendant engaged in a pattern or course of violent conduct. Defendant contends that these two findings were predicated upon the fact that he suffered from a mental illness at the time he committed the offenses for which he was convicted, and therefore violate G.S. 15A-1340.4(a)(1)(p). This statute provides that "the same item of evidence may not be used to prove more than one factor in aggravation." Defendant notes that in *State v. Higson*, 310 N.C. 418, 312 S.E. 2d 437, this Court reviewed the

trial court's findings in aggravation that (1) the defendant is an extremely dangerous mentally abnormal person, and (2) the defendant's conduct during the crime indicates a serious threat of violence and agreed with that defendant's contention "that these two factors are duplicitous and both are proved by the same evidence." *Id.* at 423, 312 S.E. 2d at 440-41. We note a distinction, however, between the second factor found in *Higson* and the second factor found by the trial judge in the present case. In *Higson*, the second non-statutory factor found was that the defendant's violent conduct *during this crime* indicates a serious threat of violence. In the present case the second non-statutory factor found was that defendant engaged in a pattern or course of violent conduct which included the commission by defendant of *other crimes* of violence against other persons.

In *Higson*, after first holding that the finding that the defendant was an extremely dangerous abnormal person was amply supported by the evidence of record, this Court said:

> We do not agree, however, that under the facts of this case it is relevant to consider as a separate aggravating factor that 'defendant's conduct during the crimes indicates a serious threat of violence.' Here, the defendant pled guilty to second degree murder and to assault with a deadly weapon with intent to kill inflicting serious injury. Both crimes, by definition, are crimes of violence. Presumably the threat of violence *inherent in these* crimes was considered in determining the presumptive sentences for the offenses. (Emphasis added.) (Citations omitted.)

*State v. Higson*, 310 N.C. at 424, 312 S.E. 2d at 441.

In the present case, in addition to the evidence relating to the violent acts committed by defendant at the IBM Complex on 30 August 1982, there was evidence that prior to that date defendant had hit several members of his family during attacks of rage, shot a gun while angry at one of his neighbors, hit his boss at another company where he once worked, and was involved in two fist fights. Thus, we conclude that there was sufficient evidence that defendant had engaged in a pattern or course of violent conduct to support the judge's finding of that factor in aggravation separate and apart from the evidence of the psychiatrist which supported the aggravating factor relating to defend-

ant being a dangerous and mentally abnormal person. Thus, it appears that the trial court's findings in aggravation were not based on the same item of evidence. Likewise, the findings are related to different sentencing purposes. The finding that defendant is a dangerous and mentally abnormal person is related to the protection of the public by restraining offenders; the finding that defendant engaged in a pattern or course of violent conduct is related to the offender's culpability and to providing a general deterrent to criminal behavior. *See* N.C. Gen. Stat. § 15A-1340.3 (1983). We conclude that the trial court's findings in aggravation were not based on the same item of evidence in violation of G.S. 15A-1340.4(a)(1)(p).

## XXI.

[23] Defendant next argues that the trial court erred in failing to find as mitigating factors in the non-capital felony cases all of the mitigating factors specifically found by the jury in the sentencing phase of the capital case. The jury found nine mitigating factors and one aggravating factor. The trial judge found four mitigating and three aggravating factors, and ruled that the aggravating factors outweighed the mitigating factors. In *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689, this Court noted that:

The fair sentencing act did not remove, nor did it intend to remove, all discretion from the sentencing judge. Judges still have discretion to increase or reduce sentences from the presumptive term upon findings of aggravating or mitigating factors, the weighing of which is a matter within their sound discretion. Thus, upon a finding by the preponderance of the evidence that aggravating factors outweigh mitigating factors, the question of whether to increase the sentence above the presumptive term, and if so, to what extent, remains within the trial judge's discretion.

The discretionary task of weighing mitigating and aggravating factors is not a simple matter of mathematics. For example, three factors of one kind do not automatically and of necessity outweigh one factor of another kind. The number of factors found is only one consideration in determining which factors outweigh others. Although the court is required to consider all statutory factors to some degree, it may very properly emphasize one factor more than another

in a particular case. N.C. Gen. Stat. 15A-1340.4(a). The balance struck by the trial judge will not be disturbed if there is support in the record for his determination.

*Id.* at 597, 300 S.E. 2d at 697 (citations omitted).

The Court further held that:

There is a presumption that the judgment of a court is valid and just. The burden is upon appellant to show error amounting to a denial of some substantial right . . . . A judgment will not be disturbed because of sentencing procedures unless there is a showing of abuse of discretion, procedural conduct prejudicial to defendant, circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.

*Id.* at 597-98, 300 S.E. 2d at 697 (citations omitted).

There is no evidence that the trial judge abused his discretion in the sentencing phase of the trial by not finding the same mitigating factors as those found by the jury. We find no error.

## XXII.

In defendant's final assignment of error, he argues that the trial court erred in failing to merge the felonious entry convictions and all of the felonious burning or attempting to burn convictions into the felony murder conviction. Defendant further argues that the trial court erred in imposing consecutive sentences on all four felonious entry convictions and on two of the burning or attempting to burn a building used in trade convictions.

In this assignment of error, defendant again argues that the IBM Complex is one building and therefore he could only be convicted of one charge of felonious burning and one charge of felonious entry. For the reasons stated in Part IX of this opinion, we hold that the IBM Complex is comprised of four separate buildings. Therefore, we find no merit in defendant's argument.

[24] Defendant also contends that even if the Court finds that there are four separate buildings in question, each of the felonious entry and each of the felonious burning charges should serve as the underlying felony for the felony murder conviction. We

disagree. This Court has held that when a defendant has been convicted of murder in the first degree based upon a finding that the murder was committed in the perpetration of a felony, separate punishment may not be imposed for the underlying felony. *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). However, separate punishment may be imposed for any offense which arose out of the same transaction but was not the underlying felony for the felony murder conviction. *State v. Murvin*, 304 N.C. 523, 284 S.E. 2d 289 (1981).

[25] In the case *sub judice*, the trial court's instructions reveal that the only felony upon which defendant's first degree murder conviction could be based was the felonious burning or attempting to burn IBM Building 201. Thus, the first degree murder conviction under the felony murder rule was premised on the underlying felony of burning or attempting to burn Building 201 (Case No. 82-CRS-19158). The trial court properly arrested judgment on that charge. The felonious entry convictions and the two other felonious burning convictions, because they were not submitted as possible underlying felonies, were neither essential nor indispensable elements of the State's proof of murder and were not underlying felonies for the felony murder conviction. *State v. Murvin*, 304 N.C. 523, 284 S.E. 2d 289. Therefore, imposition of punishment for these convictions was proper.

Having carefully considered each of defendant's assignments of error, the decision of this Court is as follows:

| Case No. | Offense | Disposition |
|---|---|---|
| 82-CRS-19151 | Assault with a deadly weapon inflicting serious injury | No error. |
| 82-CRS-19152 | Assault with a firearm on a law enforcement officer | Judgment vacated and case remanded for sentencing on Assault With a Deadly Weapon. |

State v. Avery

| Case No. | Offense | Disposition |
|---|---|---|
| 82-CRS-19153 | Assault with a firearm on a law enforcement officer | Judgment vacated and case remanded for sentencing on Assault With a Deadly Weapon. |
| 82-CRS-19154 | Murder in the First Degree | No error. |
| 82-CRS-19155 | Assault with a deadly weapon inflicting serious injury | No error. |
| 82-CRS-19156 | Assault with a deadly weapon inflicting serious injury | No error. |
| 82-CRS-19157 | Misdemeanor assault with a deadly weapon | No error. |
| 82-CRS-19159 | Attempting to burn a building used for trade | No error. |
| 82-CRS-19160 | Setting fire to or burning a building used for trade | No error. |
| 83-CRS-10213 | Felonious entry of a building | No error. |
| 83-CRS-10214 | Felonious entry of a building | No error. |
| 83-CRS-10215 | Felonious entry of a building | No error. |
| 83-CRS-10216 | Felonious entry of a building | No error. |

Justice BILLINGS did not participate in the consideration or decision of this case.