STATE OF NORTH CAROLINA v. PHILLIP BOSTIC

No. COA94-1359

(Filed 19 December 1995)

**1. Homicide § 226 (NCI4th)— second-degree murder—sufficiency of evidence**

There was no error in the denial of defendant's motion to dismiss a charge of second-degree murder for insufficient evidence where the State presented evidence that defendant had a history of abusing the victim, that defendant had threatened to kill the victim on numerous occasions, and that he had told a witness that he planned to kill the victim in a graveyard. While that would be insufficient to show that defendant was the person who killed the victim under *State v. Lee*, 294 N.C. 299, here the State also presented evidence that defendant was seen hitting the victim near the cemetery where she was found at 4:30 a.m. the morning the police received the phone call regarding her body at 9:00 a.m.;

that defendant was overheard in jail telling another inmate that he killed the victim; and that he had told another witness that he had killed the victim.

**Am Jur 2d, Homicide §§ 44, 53, 246, 260.**

2. **Homicide § 307 (NCI4th)— second-degree murder—evidence of malice—sufficient**

There was sufficient evidence of malice in a second-degree murder prosecution in that defendant told the victim he planned to kill her in a cemetery because he thought the victim was cheating on him and had tried to have him killed; defendant had threatened to kill the victim while walking through a cemetery approximately one week before the victim's death, saying he had not done "the job right" the first time, but would the next time; there was medical testimony that the victim had died as a result of a subdural hematoma which could have been the result of a fall, a blow to the head, or a violent shaking of the body; defendant had told a witness to hit his woman only in places where there would be no physical evidence of the beatings; there was evidence that three of the victim's ribs had been fractured near the time of her death; the victim had a torn thumbnail, there were scratches on her abdomen, and she was not wearing one of her shoes; and the victim was found in a remote part of a cemetery with her hands folded across her midsection.

**Am Jur 2d, Homicide §§ 50, 51, 215, 227, 438, 488.**

**Inference of malice or intent to kill where killing is by blow without weapon. 22 ALR2d 854.**

3. **Homicide § 199 (NCI4th)— second-degree murder—proximate cause of death—evidence sufficient**

There was sufficient evidence in a second-degree murder prosecution that defendant's act was a proximate cause of the victim's death where defendant was seen arguing with the victim around 4:30 a.m.; defendant told the victim, "Bitch, you're going to go down to the graveyard"; defendant hit the victim in the mouth; three of the victim's ribs were fractured before but near the time the victim died; there was medical testimony that the cause of the victim's death was a subdural hematoma that could have been caused by a blow to the head, a fall, or a violent shaking of the body; and defendant had previously said he knew how

to hit his woman so that there would be no external evidence of his beating her.

**Am Jur 2d, Homicide §§ 13, 454.**

**Necessity and effect, in homicide prosecution, of expert medical testimony as to cause of death. 65 ALR3d 283.**

4. **Criminal Law § 621 (NCI4th)— second-degree murder— sufficiency of evidence—circumstantial evidence—inference on inference—permitted**

Defendant erroneously argued that a jury could not have found substantial evidence of each element of second-degree murder because the State presented circumstantial evidence and the jury would have had to draw inference upon inference to conclude that defendant was guilty. The N.C. Supreme Court in *State v. Childress*, 321 N.C. 226, overruled a line of cases and held that in considering circumstantial evidence an inference may be made from an inference.

**Am Jur 2d, Homicide §§ 246, 272, 426.**

**Modern status of the rules against basing an inference upon an inference or a presumption upon a presumption. 5 ALR3d 100.**

**Modern status of rule regarding necessity of instruction on circumstantial evidence in criminal trial-state cases. 36 ALR4th 1046.**

5. **Evidence and Witnesses § 502 (NCI4th)— second-degree murder—defendant's statement concerning plea negotiations**

There was no prejudicial error in a second-degree murder prosecution where the State served defense counsel with a list of statements allegedly made by defendant, including the statement, "Yeah, I killed the bitch. I've done my time. I'll take a plea bargain and walk"; defense counsel asked the judge to rule on the admissibility of this statement, arguing that any mention of plea negotiations was prohibited; the trial court responded that N.C.G.S. § 15A-1025 did not cover the statement because it was not made during negotiations; during the trial, the court ruled that the witness could not testify to the portions of the statement that men-

tioned plea negotiations, so the witness testified only that he overheard defendant say "I killed the bitch and I'm gonna walk"; and the trial court refused to allow defendant to offer evidence of plea negotiations to explain the statement. It was clear that defendant did not admit his guilt to the other inmate in order to get a plea bargain and, because the statement did not indicate that defendant or his counsel and the prosecutor engaged in plea discussions, N.C.G.S. § 15A-1025 did not prohibit the witness from testifying to the entire statement. However, defendant has not shown that the jury would have reached a different result absent the error and, finally, defendant's attempt to offer evidence of his refusing a plea bargain flies in the face of N.C.G.S. § 15A-1025.

**Am Jur 2d, Homicide §§ 270, 293, 341-344.**

**Applicability of attorney-client privilege to communications made in presence of or solely to or by third person. 14 ALR4th 594.**

**What is accused's "statement" subject to state court criminal discovery. 57 ALR4th 827.**

6. **Evidence and Witnesses § 701 (NCI4th)— second-degree murder—prior offenses—limiting instruction**

The instruction given by the court in a second-degree murder prosecution was a proper limiting instruction pursuant to N.C.G.S. § 8C-1, Rule 105 and adequately informed the jury not to consider the N.C.G.S. § 8C-1, Rule 404 (b) evidence to show that defendant acted in conformity therewith on the occasion the victim died. *State v. Coffey*, 326 N.C. 268, provides that when evidence is competent for a restricted purpose, it is not error for the trial court to admit the evidence without a limiting instruction unless the defendant requests a limiting instruction. It does not require that the trial court give the precise instruction requested by the defendant.

**Am Jur 2d, Homicide §§ 493, 496, 560.**

**Right to impeach credibility of accused by showing prior conviction, as affected by remoteness in time of prior offense. 67 ALR3d 824.**

**7. Evidence and Witnesses § 702 (NCI4th)— second-degree murder—prior offenses—limiting instruction before testimony—not given—no abuse of discretion**

The trial court did not abuse its discretion in a second-degree murder prosecution by not giving a limiting instruction before each witness testified to defendant's prior acts of physical abuse against the victim. The trial court has discretion in determining whether to give instructions requested by the parties, and N.C.G.S. § 15A-1231(c) contemplates that the trial court must instruct the jury after the arguments are completed.

**Am Jur 2d, Homicide §§ 493, 496, 560.**

**Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters. 63 ALR3d 311.**

Appeal by defendant from judgment and commitment entered 14 June 1994 by Judge B. Craig Ellis in Scotland County Superior Court. Heard in the Court of Appeals 26 September 1995.

This case arises from the murder of Debra McRae Sloan (hereinafter the victim), defendant's girlfriend with whom he lived at the time of her death. Defendant was arrested and tried on the charge of second degree murder.

At trial, the State's evidence tended to show that on 8 May 1992, defendant and the victim entered the Backlot Club in McColl, South Carolina between 5:00 p.m. and 6:00 p.m. and remained at the club until approximately 1:00 a.m. The victim appeared to be in good physical condition when the couple left the bar together. Defendant asked Michael Washington for a ride back to Laurinburg. Mr. Washington said he would give the couple a ride after he went to the Duke Jones Club. Defendant, the victim, and another woman rode to the Duke Jones Club with Mr. Washington. Defendant and the victim stayed in the car while Mr. Washington and the woman went into the club with some of their friends. They stayed at the club for three to four hours. Mr. Washington then drove defendant and the victim back to Laurinburg and dropped them off in front of Deberry Upholstery which is at an intersection near Cedar Grove Cemetery at approximately 4:30 a.m. As the victim got out of Mr. Washington's vehicle, defendant said "[h]urry up and get your ass on out the car." Mr. Washington testified at trial that the victim still appeared to be in

good physical condition when he left defendant and the victim by the side of the road.

Karen McCoy saw defendant and the victim walking near the Deberry intersection around 4:30 a.m. on 9 May 1992. Ms. McCoy testified at trial that defendant was "fussing at" the victim and hit her in her mouth with his fist. The victim was crying and kept telling defendant that she did not want to go down to the graveyard, but defendant said: "Bitch, you're going to go down to the graveyard."

At approximately 9:00 a.m. on 9 May 1992, Laurinburg Police Department patrolman Doug Ikner testified that he received a telephone call from a male who told him there was a body laying on the dirt road behind Cedar Grove Cemetery. Patrolman Ikner drove along the road but found no body. On 10 May 1992, after Patrolman Ikner received another call, he returned to the road and got out of his car to search for the body. He finally found the body on a little pathway at the curved portion of the dirt road. The corpse was later identified through fingerprint comparisons on file with the Laurinburg Police Department as the victim, Debra Sloan. When Patrolman Ikner discovered the victim, her hands were crossed at her midsection and her right shoe was lying on the ground "off of the right foot." She had a white substance on her right eye and in the right corner of her mouth, and there was some fuzz on the left side of her head, mouth, and on her left ear.

Dr. Karen E. Chancelor performed an autopsy on the victim on 11 May 1992. Dr. Chancelor testified at trial that the victim had been dead from one to several days at the time of the autopsy. There were several scratches on the victim's abdomen and the right thumbnail was torn. Dr. Chancelor discovered that three of the victim's ribs were fractured and opined that the fractures preceded the victim's death but occurred near the time of death. Dr. Chancelor also discovered a subdural hematoma around the victim's brain which could have been caused by a blow to the head, a fall, or a violent shaking of the body. Dr. Chancelor did not find any external abrasions or bruises that would be associated with the subdural hematoma. Dr. Chancelor opined that the cause of the victim's death was head trauma, resulting in a subdural hematoma.

The State presented several witnesses at trial who testified to a pattern of violence committed by defendant against the victim over a number of years. Ethel Rogers, the victim's mother, testified that she saw her daughter in 1989 after defendant had beaten her "with a drop

cord or belt" across her legs and her body. In addition to the injuries on her body, the victim had a gauze patch over one of her eyes. Ms. Rogers also testified that the victim was hospitalized in June 1991 for approximately eleven days as a result of being beaten. On that occasion, the victim's face was swollen, she had dried blood around her lip, her eyes were swollen shut, and she had a cigarette burn in the middle of her chest. The victim told her mother that defendant was the person who had beaten her.

Felipe Sloan, the victim's twelve-year-old son, testified that he saw defendant hit his mother with a drop cord and his fist "[a]bout five or six" times "[a]bout every other night." Felipe also stated that defendant often threatened to kill his mother. Beulah Cureton, a neighbor of defendant and the victim, testified that she heard defendant fighting with the victim and the victim screaming and pleading "don't kill me, don't kill me" approximately every other night. Lois Hennigan, another neighbor, testified that she saw defendant strike the victim a few months before the victim's death. Ms. Hennigan testified that she also had heard the victim scream and beg defendant not to kill her.

Calvin Brown testified that on a Friday evening approximately one week before the victim's death, he walked with defendant and the victim through Hillside Cemetery, which is approximately one mile away from Cedar Grove Cemetery. Defendant told Mr. Brown that he was mad because he had been in jail for not doing "the job right." Mr. Brown testified that defendant "kept telling [the victim] he was gonna kill her; that's [sic] he's gonna fix her for having to stay in jail; that he shoulda killed her the first time, but this time he [would] kill her." Defendant then began punching the victim and hit her approximately eleven times. Defendant had previously told Mr. Brown that he should always hit his "woman" in places where there would be no visible physical evidence of the beatings, like "in the back of the head." Mr. Brown testified he had witnessed defendant beating the victim on approximately five separate occasions when he was a guest at their house. Mr. Brown testified that after defendant was arrested for the victim's death and Mr. Brown was also in jail on unrelated charges, defendant offered to pay Mr. Brown if Mr. Brown "ke[pt] [his] mouth shut."

Mary Gunter testified that she heard the victim scream "four or five times a week." She would scream "[d]on't kill me, Phillip. You're gonna kill me." On one occasion, Ms. Gunter saw defendant after he

told Ms. Gunter's daughter that he was going to kill the victim. Ms. Gunter asked defendant if he was serious. Defendant laughed and responded "heh, heh, I was just joking." However, defendant then said twice "I got my time set."

Sandra Gunter-Cureton, Ms. Gunter's daughter, testified that on one occasion when she was at her parents' house, she heard defendant hitting the victim and he said "I am going to kill you." Ms. Gunter-Cureton also testified to a time when she saw defendant and asked him how the victim was. Defendant responded "I left her to die, but the bitch didn't die." Defendant then explained that he thought the victim was cheating on him and that she had tried to have him killed, "[b]ut I have my time set for her and I have the place set." He then said "I'm going to kill her in a graveyard." When Ms. Gunter-Cureton asked why in a graveyard, he said "[b]ecause there is a path in this graveyard. . . . [N]o one will hear her when she holler, and no one will see her when I kill her."

John Hennigan testified that he was incarcerated in the Scotland County jail in March 1993 and heard the defendant tell another inmate "I killed the bitch and I'm gonna walk." James Hill testified that while he was incarcerated in the Scotland County jail, he had a conversation with defendant during which defendant said he killed the victim "and she didn't holler." Mr. Hill said that he and defendant got into an argument on another date and that defendant again said he had killed the victim.

Defendant offered no evidence. The jury found defendant guilty of second degree murder and the trial court sentenced defendant to life in prison.

Defendant appeals.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Grayson G. Kelley, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender J. Michael Smith, for defendant-appellant.*

EAGLES, Judge.

## I.

[1] Defendant first argues that the trial court erred in denying defendant's motions to dismiss the charge of second degree murder because the evidence presented was insufficient as a matter of law.

When a party moves to dismiss based on insufficiency of the evidence, the trial court must determine whether there is substantial evidence of each element of the crime charged. *State v. Bates*, 309 N.C. 528, 533-34, 308 S.E.2d 258, 262 (1983). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. O'Rourke*, 114 N.C. App. 435, 441, 442 S.E.2d 137, 140 (1994). The trial court must view the evidence in the light most favorable to the State and must draw every reasonable inference in its favor. *State v. Furr*, 292 N.C. 711, 715, 235 S.E.2d 193, 196, *cert. denied*, 434 U.S. 924, 54 L.Ed.2d 281 (1977). The evidence may be circumstantial, direct, or a combination of both. *State v. McKnight*, 279 N.C. 148, 153, 181 S.E.2d 415, 418 (1971). However, "if the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss should be allowed." *Bates*, 309 N.C. at 533, 308 S.E.2d at 262.

"[S]econd degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Allen*, 77 N.C. App. 142, 144, 334 S.E.2d 410, 411 (1985), *disc. review denied*, 316 N.C. 196, 341 S.E.2d 579 (1986). For a defendant to be guilty of second degree murder, the State must prove beyond a reasonable doubt that: 1. defendant killed the victim; 2. defendant acted intentionally and with malice; and 3. defendant's act was a proximate cause of the victim's death. N.C.P.I., Crim. 206.31A. See *State v. Snyder*, 311 N.C. 391, 393, 317 S.E.2d 394, 395 (1984).

We first determine whether the State presented substantial evidence that defendant was the person who killed the victim. In *State v. Lee*, 294 N.C. 299, 240 S.E.2d 449 (1978), the State presented evidence that the defendant had beaten the victim on two separate occasions shortly before her death. *Lee*, 294 N.C. at 301, 240 S.E.2d at 450. The State also presented the testimony of a woman who stated that the defendant had told her he was going to kill the victim. *Id.* Our Supreme Court held this evidence was insufficient to show the defendant was the person who killed the victim. *Id.* at 303, 240 S.E.2d at 451.

Here, the State presented evidence that defendant had a history of abusing the victim. Defendant had threatened to kill the victim on numerous occasions. Defendant had told Ms. Gunter-Cureton that he planned to kill the victim in a graveyard. Based on these facts alone, we would be constrained by our Supreme Court's holding in *Lee*.

However, here the State also presented evidence that defendant was seen hitting the victim near the Cedar Grove Cemetery at 4:30 a.m. the morning the police received the phone call regarding her body at 9:00 a.m. In addition, the State presented evidence that after defendant was arrested for the victim's murder, Mr. Hennigan overheard defendant tell another inmate in jail that he had killed the victim. The State also presented the testimony of Mr. Hill, who said defendant told him defendant had killed the victim "and she didn't holler." We conclude this evidence was sufficient to satisfy the State's burden of offering substantial evidence to show defendant was the person who killed the victim. *See State v. Rinaldi*, 264 N.C. 701, 704, 142 S.E.2d 604, 606 (1965) (holding that the evidence, if true, was sufficient to support a verdict that the defendant was guilty of murder where the evidence included the defendant's own statement that he was the killer) (new trial granted on other grounds). *See also State v. Lambert*, 341 N.C. 36, 460 S.E.2d 123 (1995) (where our Supreme Court held that evidence of the defendant's opportunity to kill her husband combined with her inculpatory statement while leaning over his casket: "Honey, why did you make me do it?" constituted substantial evidence to show defendant was the killer).

[2] Next, we consider whether there is substantial evidence from which a reasonable juror could determine defendant acted intentionally and with malice.

> Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. An intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties and other relevant circumstances.

> Malice means not only hatred, ill will, or spite, as it is ordinarily understood—to be sure, that is malice—but [it also means that condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in his death, without just cause, excuse or justification] [malice also arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief].

N.C.P.I., Crim. 206.31A. *See State v. Snyder*, 311 N.C. 391, 393-94, 317 S.E.2d 394, 395-96 (1984).

STATE v. BOSTIC

[121 N.C. App. 90 (1995)]

Here, the State presented the testimony of Ms. Gunter-Cureton that defendant told her he planned to kill the victim in a cemetery because he thought the victim was cheating on him and had tried to have him killed. Mr. Brown testified that while he, defendant, and the victim were walking through a cemetery approximately one week before the victim's death, defendant threatened to kill the victim and said he had not done "the job right" the first time, but he would do it correctly the next time. Dr. Chancelor testified that the victim died as the result of a subdural hematoma which could have been the result of a fall, a blow to the head, or a violent shaking of the body. Mr. Brown testified that defendant had told him to hit his woman only in places where there would be no physical evidence of the beatings. There was evidence that three of the victim's ribs had been fractured near the time of her death. The victim had a torn thumbnail, there were scratches on her abdomen, and she was not wearing one of her shoes. The victim was found in a remote part of a cemetery with her hands folded across her midsection. From this evidence, we conclude the State satisfied its burden of showing that defendant acted intentionally and with malice.

[3] Finally, we must determine whether there was substantial evidence that defendant's act was a proximate cause of the victim's death. To be a proximate cause, a defendant's act does not have to be the immediate cause of death. A defendant is accountable if the victim dies as a natural result of the defendant's act. State v. Jones, 290 N.C. 292, 298, 225 S.E.2d 549, 552 (1976). Here, defendant was seen arguing with the victim around 4:30 a.m. on 9 May 1992. Defendant told the victim: "Bitch, you're going to go down to the graveyard." Defendant hit the victim in the mouth. Dr. Chancelor found that three of the victim's ribs were fractured before but near the time the victim died. Dr. Chancelor testified that the cause of the victim's death was a subdural hematoma that could have been caused by a blow to the head, a fall, or a violent shaking of the body. Defendant previously had said he knew how to hit his woman so that there would be no external evidence of his beating her. We conclude that a reasonable juror could have concluded from this evidence that defendant beat the victim during the early morning hours of 9 May 1992 in or near Cedar Grove Cemetery, that during this beating, defendant violently shook the victim, and that the victim died as a proximate result of these actions. Accordingly, defendant's assignment of error is without merit.

**[4]** We note that defendant argues that a jury could not have found substantial evidence of each element of second degree murder because the State presented circumstantial evidence and the jury would have had to draw inference upon inference to conclude defendant was guilty. Defendant relies on *State v. Byrd*, 309 N.C. 132, 305 S.E.2d 724 (1983) to argue that a jury cannot draw one inference from another. Defendant's reliance is misplaced. In 1987, our Supreme Court overruled a line of cases including *Byrd* and held that "in considering circumstantial evidence an inference may . . . be made from an inference." *State v. Childress*, 321 N.C. 226, 232, 362 S.E.2d 263, 267 (1987).

## II.

**[5]** Defendant next argues that the trial court erred by denying defendant's request to offer evidence of plea negotiations between the prosecution and himself. To understand defendant's argument, it is necessary to review some of the proceedings during the trial.

As required by G.S. 15A-903(a)(2), the State served defense counsel with a list of statements allegedly made by defendant, including the statement: "Yeah, I killed the bitch. I've done my time. I'll take a plea bargain and walk." During trial, defense counsel asked the trial court to rule on the admissibility of this statement, arguing that G.S. 15A-1025 prohibited any mention of plea negotiations and that if this statement came in, defendant's counsel would have to explain the context of defendant's remarks by going into "a complete history of every plea negotiation that was made in the matter." The trial court responded that G.S. 15A-1025 did not cover this statement because it was not made during actual plea bargain negotiations.

Defense counsel then suggested that this statement was not the only statement made by defendant that defense counsel might find objectionable and asked the State to specify the testimony of each of its witnesses so that the trial court could rule on the admissibility of all of the upcoming testimony which dealt with statements allegedly made by defendant. The prosecutor replied that he would not "let [defense] counsel stake [him] out as to what a prospective witness [would] be saying [at trial]." The trial court resolved the matter by ordering that no witnesses could mention plea negotiations in their testimony.

It later became apparent that Mr. Hennigan was the State's witness who overheard defendant tell another inmate: "Yeah, I killed the bitch. I've done my time. I'll take a plea bargain and walk." Defense

counsel once again asked the trial court to rule on the admissibility of this testimony. After conducting a voir dire of Mr. Hennigan, the trial court stated that Mr. Hennigan's testimony showed that defendant did not make his statement in order to get a plea bargain. The trial court ruled that Mr. Hennigan could not testify to the portions of the statement that mentioned plea negotiations. Accordingly, Mr. Hennigan only testified in front of the jury that he overheard defendant say: "I killed the bitch and I'm gonna walk."

Defense counsel argued at the time the trial court made its ruling and defendant argues now that if Mr. Hennigan could not mention anything about plea negotiations but could testify to the portion of the statement where defendant said "[y]eah, I killed the bitch and I'll walk," defense counsel should have been able to offer evidence that defendant "unilaterally refused a plea bargain on the basis that he refused to make an admission of guilt" and that defendant's actual statement was: "I would have to admit that I killed the bitch to take the plea bargain and walk." Defendant contends that the trial court's refusal to allow him to offer evidence of plea negotiations to explain the statement testified to at trial by Mr. Hennigan unfairly prejudiced him.

Before addressing defendant's contention, we first note that the trial court erred by not allowing Mr. Hennigan to testify to the entire statement he overheard. As the trial court stated when it made its ruling, it was clear from Mr. Hennigan's voir dire testimony that defendant did not admit his guilt to the other inmate in order to get a plea bargain. Because the statement overheard by Mr. Hennigan did not in any way indicate that "defendant or his counsel and the prosecutor engaged in plea discussions," G.S. 15A-1025 did not prohibit Mr. Hennigan from testifying to the entire statement he overheard.

G.S. 15A-1443(a) states in part: "A defendant is prejudiced by errors . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice . . . is upon the defendant." Here, although the trial court erred by prohibiting Mr. Hennigan from testifying to defendant's entire statement, defendant has not shown that, absent this error, the jury would have reached a different result. Several witnesses testified that they overheard defendant threaten to kill the victim. Ms. Gunter-Cureton testified that defendant told her he had the time and place set to kill the victim and that he was going to do it in

STATE v. BOSTIC

[121 N.C. App. 90 (1995)]

a graveyard. Ms. McCoy testified that she saw defendant hit the victim in the face around 4:30 a.m. on 9 May 1992 and that defendant told the victim: "Bitch, you're going to go down to the graveyard." Mr. Brown testified that defendant offered to pay Mr. Brown if he "just ke[pt] [his] mouth shut." Mr. Hill testified that defendant told him defendant killed the victim.

We now address defendant's contention that the trial court erred by refusing to allow defendant to admit evidence of plea negotiations to explain defendant's statement. G.S. 15A-1025 is clear. "The fact that the defendant or his counsel and the prosecutor engaged in plea discussions or made a plea arrangement may not be received in evidence against or in favor of the defendant in any criminal or civil action or administrative proceedings." G.S. 15A-1025. Defendant's attempt to offer evidence of his refusing a plea bargain flies in the face of G.S. 15A-1025. The trial court did not err in refusing his request. This assignment of error fails.

## III.

[6] Defendant also argues that the trial court erred by failing to give, in addition to the pattern jury instruction dealing with Rule 404(b) evidence, another instruction limiting the use of evidence of defendant's prior misconduct toward the victim so that it could not be used in determining whether the victim died as the result of a criminal act and whether defendant committed the criminal act. Rule 105 of the North Carolina Rules of Evidence provides in part that when evidence is admissible for one purpose but not another purpose, the trial "court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." G.S. 8C-1, Rule 105.

Here, the trial court instructed the jury during the jury charge that the evidence of "other crimes, wrongs, or acts" was admitted only to show identity, motive, intent, plan, scheme, system or design, opportunity, absence of accident, or presence of malice. The trial court also instructed the jury regarding the Rule 404(b) evidence: "If you believe this evidence, you may consider it, but only for the limited purpose for which it was received. Evidence of other crimes, wrongs, or acts are not admissible to prove the character of a person in order to show that he acted in conformity therewith."

Defendant cites *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990), for the proposition that, if a defendant requests a particular limiting instruction, the trial court must instruct the jury accordingly.

Defendant is mistaken. *Coffey* provides that when evidence is competent for a restricted purpose, it is not error for the trial court to admit the evidence without a limiting instruction unless the defendant requests a limiting instruction. *Coffey*, 326 N.C. at 286, 389 S.E.2d at 59. *Coffey* does not require that the trial court must give the precise instruction requested by the defendant. In fact, the trial court is only required to give requested instructions when they are "a correct statement of the law" and even then, the trial court is only required to give "the requested instructions in substance." *State v. Avery*, 315 N.C. 1, 33, 337 S.E.2d 786, 804 (1985). We conclude that the instruction given by the trial court here was a proper limiting instruction pursuant to Rule 105 and adequately informed the jury not to consider the Rule 404(b) evidence to show that defendant "acted in conformity therewith" on the occasion when the victim died. Accordingly, this assignment of error fails.

IV.

**[7]** Defendant also argues that the trial court erred by failing to give an instruction limiting the use of Rule 404(b) evidence before each witness testified to defendant's prior acts of physical abuse against the victim. Defendant has failed to preserve this argument for appellate review. Defendant's assignment of error does not reference any exception in the transcript that deals with this argument. N.C. R. App. P. 10(c)(1). Furthermore, defendant has abandoned this argument by failing to cite any legal authority in support of his argument. N.C. R. App. P. 28(b)(5). Nevertheless, we briefly address defendant's contention.

The trial court has discretion in determining whether to give instructions requested by the parties. *See Avery*, 315 N.C. at 32-33, 337 S.E.2d at 804; *State v. Bridges*, 107 N.C. App. 668, 676, 421 S.E.2d 806, 811 (1992), *aff'd*, 333 N.C. 572, 429 S.E.2d 347 (1993). We find no authority to support defendant's contention that the trial court abused its discretion here by failing to instruct the jury before each witness testified to defendant's prior acts of misconduct toward the victim. We note that G.S. 15A-1231(c) contemplates that the trial court must instruct the jury "*[a]fter* the arguments are completed." (Emphasis added.) On this record, we find no abuse of discretion. Accordingly, defendant's argument fails.

No error.

Judges JOHNSON and WYNN concur.